IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

WANDA J. GIBBS                                                    PLAINTIFF

V.                        Civil No. 2:17-cv-02105-PKH-MEF

NANCY A. BERRYHILL, Commissioner
Social Security Administration                                    DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Wanda Gibbs, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1382. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.      Procedural Background

Plaintiff filed her application for SSI on August 7, 2014, alleging an onset date of March 2, 2013, due to mental disorders, shoulder pain, and left ankle pain. (ECF No. 8, pp. 122, 135, 201-206, 224, 230-231, 258-259). Plaintiff later amended her onset date to August 1, 2014. (ECF No. 8, p. 104). On August 27, 2015, the ALJ held an administrative hearing. (ECF No. 8, pp. 101-119). Plaintiff was present and represented by counsel.

In 2015, Plaintiff was 50 years old and possessed an eighth-grade education. (ECF No. 8, p. 104, 273). Plaintiff had past relevant work ("PRW") experience as a box maker. (ECF No. 8, p. 104-105, 225, 249).

By a written decision dated January 19, 2016, the ALJ determined Plaintiff's chronic obstructive pulmonary disease ("COPD"), arthritis of the left knee, obesity, mood disorder, and anxiety disorder were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 8, p. 26). After discounting the Plaintiff's credibility, he found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, but must avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (ECF No. 8, p. 29). Further, the ALJ found the Plaintiff capable of simple, routine, and repetitive tasks, involving simple work-related decisions; few, if any, workplace changes; and, no more than occasional contact with co-workers, supervisors, and the public. (ECF No. 8, p. 29). With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as a mail room clerk, photocopy machine operator, and office helper. (ECF No. 8, pp. 37-38).

The Appeals Council denied the Plaintiff's request for review on April 24, 2017, despite Plaintiff's submission of additional medical records from Sparks Health System and Dr. John Lange.[1] (ECF No. 8, pp. 5-11). Subsequently, Plaintiff filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 11, 13), and the case is now ready for decision.

## II.    Applicable Law

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial

---

[1] The Appeals Council denied Plaintiff's request for review on February 27, 2017. (ECF No. 8, pp. 12-18). However, on April 24, they set aside their earlier denial, reviewed the newly submitted evidence, and again denied her request for review. (ECF No. 10, pp. 5-11).

evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical

3

and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  20 C.F.R. § 416.920(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920(a)(4)(v).

### III.  Evidence Presented

The undersigned has conducted a thorough review of the entire record in this case, but will only recount the evidence relevant to the Plaintiff's claims on appeal.

On January 5, 2012, Dr. Patricia Walz conducted a mental diagnostic evaluation in relation to Plaintiff's prior application for benefits.  (ECF No. 8, pp. 272-277).  Plaintiff's mood was anxious and her thought content notable for a death wish, but she denied suicidal ideations.  Dr. Walz diagnosed major depression and antisocial traits, and assessed a global assessment of functioning ("GAF") score of 60-70.  She indicated that Plaintiff's capacity to communicate and interact was notable for dramatic tendencies, her intellectual functioning was estimated to be in the borderline range, she would have difficulty with complex tasks, her attention and concentration were significantly impaired, she gave up easily on tasks, and her speed of information processing was average; however, she also suspected that Plaintiff's effort was poor.

4

On August 27, 2013, a diagnostic evaluation at Western Arkansas Counseling and Guidance Center ("WACGC") indicates Plaintiff initially sought treatment for anger and depression after filing for disability.  (ECF No. 8, pp 289-292, 301-308).  She now wanted continued treatment to deal with depression, anxiety, and the recent death of her mother.  Plaintiff reported taking Prozac and Xanax.  Her mood was depressed, her affect appropriate, her thoughts logical, her memory intact, her abstracting ability normal, her insight fair, and her judgment good.  Counselor, Dinora Reyes, diagnosed Plaintiff with mood disorder not otherwise specified and bereavement and assigned her a GAF score of 64.  She recommended individual therapy and medication management.

That same day, Plaintiff presented for pharmacologic management.  (ECF No. 8, pp. 293-294).  She continued to grieve the loss of her mother, but she had not visited her mother's gravesite and refused to go through her mother's belongings.  James Gattis, an advanced practical nurse, noted full orientation, no SI or HI, good concentration, good judgment, and medication compliance.  Due to the possibility of antidepressants interfering with the grief process, her medications were left unchanged.

On December 3, 2013, Plaintiff was treated for hypertension, hepatitis C, back pain, GERD, and bronchitis.  (ECF No. 8, p. 282-283).  She had a decreased range of motion in her back, a cough, congestion, and dyspnea.

On December 18, 2013, Plaintiff reported that financial problems had caused her to reduce her medication dosages.  (ECF No. 8, pp. 295-296).  She did feel the addition of Abilify was beneficial, but had cut back to half her recommended dosage due to "increased activation."  Plaintiff admitted, however, that she had been inconsistent with both medications, began

feeling overwhelmed, and had cut her arms and legs. She reported occasional problems with sleep, but later complained of low energy and stated she had been sleeping "a lot." Nurse Gattis noted full orientation, no SI or HI, good concentration, good insight and judgment, and medication noncompliance. Nurse Gattis advised her to take her medications as prescribed and increased her dose of Prozac.

On March 25, 2014, Plaintiff was treated for a cough, body aches, fatigue, and congestion. (ECF No. 8, pp. 338-339, 430-431). Dr. Carney noted crackles in her lungs and diagnosed bronchitis.

On March 31, 2014, Plaintiff continued to take Prozac, but she had run out of Abilify. (ECF No. 297-298). She was having trouble getting up in the mornings and did not want to leave her house. Her mental status remained unchanged. Nurse Gattis advised her to resume the Abilify and continue Prozac unchanged. He also discussed the importance of individual therapy.

On April 30, 2014, Plaintiff returned to Dr. Carney for a recheck and medication refills. (ECF No. 8, p. 337, 340, 428-425). She had no other complaints, but a physical exam revealed a decreased range of motion in her extremities.

On May 28, 2014, Plaintiff reported that her mood was "okay" and she felt improvement since resuming the Abilify. (ECF No. 8, pp. 299-300, 347-348). There was no change in socialization, and she denied any problems with sleep, appetite, energy, or motivation. Nurse Gattis noted an unchanged mental status. She was compliant with medication, and the medication was effective for the targeted symptoms.

6

On August 5, 2014, Plaintiff requested a refill of her Fluoxetine.  (ECF No 8, p. 346). Nurse Gattis opined that she should have run out of medication approximately two weeks earlier, but Plaintiff advised him she had missed a few doses "here and there."  She also advised Nurse Gattis that her ex had recently been released from prison and was causing a lot of problems.  He reminded her of the importance of taking her medications as prescribed and granted the refill.

On August 19, 2014, Plaintiff was hospitalized for four days due to complaints of shortness of breath.  (ECF No. 8, pp. 312-332).  Although an examination revealed wheezing, she was alert and fully oriented, had a normal mood and affect, and exhibited a normal range of motion in all areas tested.  A chest x-ray showed coarsened bronchovascular markings, stable since the last x-ray, but possibly representing chronic lung disease.  Despite emergency room treatment, Plaintiff's wheezing persisted and she was admitted for observation.  She ultimately improved with treatment and was released on August 22, 2014.  Her final diagnoses were cough, shortness of breath, wheezing, COPD with acute exacerbation, and asthma with acute exacerbation.

On August 23, 2014, Plaintiff returned for a follow-up and medication refills from Dr. Carney.  (ECF No. 8, pp. 426-427).  She reported continued knee pain with some associated swelling.  An examination did reveal a decreased range of motion in her extremities.

On August 26, 2014, Plaintiff presented for follow-up and medication refills.  (ECF No. 8, pp. 336, 341).  She reported continued knee pain with some associated swelling, and requested an increased dose of Hydrocodone.  A physical exam revealed a decreased range of motion in her extremities.

On August 27, 2014, Plaintiff's mood was down due to financial difficulties and a new medical issue. (ECF No. 8, pp. 349-350). She reported occasional crying spells and feelings of hopelessness, worthlessness, and guilt. Nurse Gattis voiced some concern regarding the combination of Xanax, Ambien, and Hydrocodone, given her diagnoses of COPD and asthma, but Plaintiff minimized the significance and showed a lack of concern. Because her medication was effective for the targeted symptoms, Nurse Gattis continued her medications unchanged and gave her samples of Ability. He noted, "[t]he majority of patient's complaints are felt to be non-pharmacological in nature to which she agrees."

On September 18, 2014, Dr. Diane Kogut, a non-examining consultant, reviewed Plaintiff's records and concluded that her affective disorders resulted in a mild restriction of activities of daily living (ADLs); moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and, no episodes of decompensation. (ECF No. 8, pp. 126-127). She also noted moderate limitations in the following areas: completing a normal workday or workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in work setting; and, setting realistic goals or making plans independently of others. (ECF No. 8, pp. 129-131).

On October 7, 2014, Dr. Ronald Davis reviewed Plaintiff's medical records and concluded she could perform light work. (ECF No. 8, pp. 127-128). Dr. Davis found no postural, manipulative, visual, communicative, or environmental limitations.

On October 24, 2014, Plaintiff returned for a follow-up appointment with Dr. Carney. (ECF No. 8, pp. 378-381, 443-446).  Plaintiff was ambulating normally, fully alert and oriented, had a normal mood and affect, exhibited clear lungs and a normal heart rate and rhythm, and had normal motor strength.  There was, however, some tenderness and a limited range of motion in the musculoskeletal system.  Dr. Carney diagnosed anxiety, insomnia, osteoarthritis, and menopausal flushing.  He prescribed Alprazolam, Ambien, Hydrocodone, and Estrace.

On October 31, 2014, after reviewing the record, Dr. Winston Brown agreed with Dr. Kogut's mental assessment of the Plaintiff.  (ECF No. 8, pp. 142-143, 145-147).  In addition to the limitations found by Dr. Kogut, Dr. Brown also assessed moderate limitations in Plaintiff's ability to carry out the following activities: remember locations and work-like procedures; understand and remember detailed instructions; carry out simple and detailed instructions; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; and, adhere to basic standards of neatness and cleanliness.

On November 28, 2014, Plaintiff was hospitalized at St. Francis Health System for a COPD exacerbation and respiratory failure.  (ECF No. 8, pp. 383-410).  She reported some right lung pain and pain "everywhere" with radiation down her back.  X-rays showed mild bronchial wall thickening, suggesting bronchitis.  An exam revealed diminished breath sounds,

bilateral wheezing, and labored respirations. Plaintiff was treated via Albuterol updrafts, Atrovent, Prednisone, and Azithromycin, and she was released home on December 1, 2014.

On December 22, 2014, Plaintiff reported a headache and difficulty breathing. (ECF No. 8, pp. 439-442). She requested Zithromax. An examination revealed musculoskeletal tenderness, a limited range of motion, and a bony abnormality. Dr. Carney diagnosed anxiety, osteoarthritis, nausea, bronchitis, and insomnia. He prescribed Alprazolam, Hydrocodone, Promethazine, Levaquin, a Medrol Dosepak, and Ambien.

On December 23, 2014, Dr. Janet Cathey affirmed Dr. Davis' physical RFC of light work. (ECF No. 8, pp. 144-145).

On February 20, 2015, Plaintiff complained of migraines and requested Gabapentin. (ECF No. 8, pp. 435-438, 454-455, 575-577). On exam, she was obese and acutely ill. Although musculoskeletal tenderness, a limited range of motion, and a bony abnormality were noted on exam, Plaintiff was ambulating normally. Dr. Carney diagnosed anxiety, osteoarthritis, insomnia, and nausea. He prescribed Alprazolam, Hydrocodone, Gabapentin, Ambien, and Promethazine.

On February 25, 2015, Plaintiff sought treatment for mixed incontinence and urinary frequency. (ECF No. 8, pp. 419-424, 456-459, 500-506). She reported nocturnal accidents, as well as leaking with coughing, sneezing, or moving. Plaintiff had been taking Oxybuytnin for almost a year without improvement. An examination revealed some rotation of the urethra, but no other abnormalities. Urologist, Dr. John Lange, ordered a cystoscopy and prescribed Vesicare.

On March 5, 2015, Nurse Gattis recorded a normal mental status with medication compliance and effectiveness for the targeted symptoms. (ECF No. 8, pp. 415-416). He made no changes to her medication.

On March 17, 2015, Plaintiff underwent a diagnostic evaluation at WACGC. (ECF No. 8, pp. 478-487). She was seeking continued treatment for her anger and depression, and she reported anxiety and fear related to her recent diagnosis of COPD. Although Plaintiff complained of mood swings, she exhibited a calm mood and appropriate affect. Her thoughts were logical and coherent, concentration normal, memory intact, fund of information consistent with her background, abstracting ability normal, and insight and judgment good. Counselor Reyes diagnosed mood disorder NOS and bereavement and assessed a GAF score of 64. She recommended individual therapy and medication management to increase mood stability.

On April 4, 2015, Plaintiff presented for medication management. (ECF No. 8, pp. 488-490). She had not seen Nurse Gattis since August 2014. A urine drug screen prior to her appointment was positive for marijuana and benzodiazepines. Plaintiff admitted to using methamphetamine the previous day and to the occasional use of marijuana. Her mood was depressed, concentration good, thoughts logical, and judgment and insight good. Although she claimed to be feeling more depressed and staying at home in bed, Nurse Gattis found this to be contradicted by her substance use. Plaintiff was also reportedly compliant with her medications, but the effectiveness of those medications could not be assessed due to her drug use. As a result, Nurse Gattis refused to prescribe Plaintiff additional medication, instead referring her to Horizon for an ADAP assessment.

11

On April 17, 2015, Plaintiff requested samples of Abilify and refills of her other medications. (ECF No. 8, pp. 495-499, 546-550). She reported 90 percent pain relief with her current medications, although her exam continued to show tenderness, a limited range of motion, and a bony deformity in her musculoskeletal system. Dr. Carney diagnosed anxiety, depression, insomnia, and osteoarthritis. He prescribed Alprazolam, Prozac, Ambien, and Hydrocodone.

On May 20, 2015, Plaintiff was treated in the emergency room for lower back pain and muscle spasm. (ECF No. 8, pp. 572-574). She was prescribed Carbatrol and Tylenol 3.

On June 12, 2015, Plaintiff presented for a follow-up exam. (ECF No. 8, pp. 492-495, 542-546). She exhibited musculoskeletal tenderness, a limited range of motion, and a bony deformity. Dr. Carney diagnosed anxiety, osteoarthritis, and insomnia. He prescribed Alprazolam, Hydrocodone, and Ambien.

On July 28, 2015, Plaintiff presented for further work-up of her mixed incontinence. (ECF No. 8, pp. 513-518, 582-584). She was unable to take Vesicare and Detrol because her insurance would not pay for them. Dr. Lange performed a cystoscopy, which revealed a normal urethra, no bladder stones or tumors, and a normal bladder wall and mucosa.

On August 12, 2015, Plaintiff reported she had stopped smoking in July. (ECF No. 8, pp. 538-542). Dr. Carney refilled Alprazolam, Hydrocodone, and Ambien.

On August 12, 2015, Dr. Carney completed a medical source statement. (ECF No. 8, pp. 507-509). He indicated she could lift and/or carry less than 10 pounds; stand and walk up to 2 hours in an 8-hour workday; sit less than 6 hours in an 8-hour workday; occasionally climb, balance, and kneel; and, never crouch or crawl. Further, Dr. Carney opined Plaintiff

12

was limited in her ability to reach in all directions and handle due to pain and weakness in her upper extremities. He also concluded she would have limitations working near temperature extremes, dust, hazards, fumes, odors, chemicals, and gases, as working in these conditions would exacerbate her condition.

On August 28, 2015, Plaintiff returned to Dr. Lange for complaints of incomplete emptying of her bladder and mixed incontinence. (ECF No. 8, pp. 510-513, 526-528, 579-581). She was unable to take Flomax and was now ready for surgery. Dr. Lange prescribed a trial of Ditropan and agreed to schedule her for retropubic ("RP") sling surgery as soon as possible.

On September 23, 2015, an x-ray of Plaintiff's chest revealed no acute cardiopulmonary process. (ECF No. 8, p. 566, 585). On September 28, 2015, Plaintiff underwent surgery for the placement of an RP sling. (ECF No. 8, pp. 520-525, 529-534, 587-588).

On October 9, 2015, Plaintiff requested that she be allowed to increase the frequently of her pain medication doses and reported elevated blood pressure readings. (ECF No. 8, pp. 535-538). Although her physical exam remained unchanged, her blood pressure was elevated. Dr. Carney diagnosed anxiety, osteoarthritis, insomnia, and hypertensive disorder. He granted her request, prescribed Hydrochlorothiazide, and refilled her remaining medications.

On October 12, 2015, Plaintiff followed-up with Dr. Lange. (ECF No. 8, pp. 551-557, 570). Although she continued to experience frequency and urgency, she reported doing well. Plaintiff felt her bladder was emptying well.

On October 26, 2015, Plaintiff reported staying dry despite her continued urgency, frequency, and nocturia. (ECF No. 8, pp. 558-564, 569). She requested narcotics to help with her menstrual pain, claiming that the Hydrocodone was not helpful. Dr. Lange prescribed Mobic.

On January 28, 2016, Plaintiff followed-up with Dr. Lange's physician's assistant, Lauren Smith. (ECF No. 8, pp. 568-569). She was doing well, although she continued to experience frequency and urgency. Ms. Smith recommended Plaintiff try Oxybutynin in the morning and at night.

On February 8, 2016, Plaintiff had discontinued the Abilify and Prozac, stating she felt better without the medication. (ECF No. 8, pp. 86-90). Xanax, however, helped her cope with her anxiety. Dr. Carney indicated that her mood and affect were within normal limits and her judgment was good. After diagnosing anxiety, osteoarthritis, insomnia, and depression, he prescribed Alprazolam, Hydrocodone, and Ambien.

On February 26, 2016, Dr. William King treated Plaintiff for upper respiratory symptoms. (ECF No. 8, pp. 92-94). She reported a cough and cold-like symptoms for approximately a month. Plaintiff indicated she had been treated at another walk-in clinic and was prescribed a five-day treatment course with Zithromax and Prednisone. The doctor indicated she did not appear ill and was in no distress, but she did exhibit mild to moderate wheezing and a frequent cough. Dr. King diagnosed her with exacerbation of asthma and prescribed Doxycycline, Tessalon, and a Flovent inhaler. He advised her to continue the Atrovent and Albuterol as needed.

On April 8, 2016, Plaintiff denied depression, sleep disturbances, SI, and anxiety.  (ECF No. 8, pp. 82-86).  Her examination revealed a normal gait and station, sensation, and motor strength and tone with some musculoskeletal tenderness, a limited range of motion, and a bony abnormality.  She also exhibited a normal mood and affect with good judgment and memory.  Dr. Carney diagnosed anxiety, osteoarthritis, insomnia, and depression.  He prescribed Alprazolam, Hydrocodone, Ambien, and Aripiprazole (generic for Abilify).

On April 8, 2016, Dr. Carney completed a medical source statement.  (ECF No. 8, p. 96-100).  He concluded she could lift and/or carry less than 10 pounds, stand and walk up to 2 hours of an 8-hour workday, sit for 3 hours, and work for a total of 4 hours per 8-hour workday.  Dr. Carney also indicted Plaintiff would need five or more work breaks during an eight-hour workday; must lay in a supine position for one hour; could climb, balance, squat, kneel, crouch, bend, stoop, finger, and grip less than two hours of an eight-hour workday; could reach in all directions, handle, and feel two hours per workday; and, must avoid concentrated exposure to extreme heat and cold, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (machinery or heights).  He stated that these limitations were supported by objective findings documenting stiffness and spasm in her lumber spine and lower extremities.

On June 7, 2016, Plaintiff returned to Dr. Carney with complaints of dissatisfaction with the Aripiprazole.  (ECF No. 8, pp. 78-82).  On examination, Dr. Carney noted she was obese and acutely ill, but ambulating normally with a normal mood and affect.  She had normal motor strength and tone with normal muscle strength, but continued to exhibit musculoskeletal tenderness, a limited range of motion, and a bony abnormality.  He diagnosed anxiety,

osteoarthritis, insomnia, and depressive disorder, and prescribed Alprazolam, Hydrocodone, and Ambien.

On August 8, 2016, Plaintiff was fully oriented and her mood and affect were normal. (ECF No. 8, pp. 74-78).  Dr. Carney also noted normal motor strength and tone with no contractures or malalignment and a normal gait and station.  He diagnosed anxiety, osteoarthritis, insomnia, and depressive disorder, and refilled her medications.

On October 3, 2016, Plaintiff was treated for bronchitis and an upper respiratory infection.  (ECF No. 8, pp. 69-74).  A physical exam revealed a normal mood and affect, normal breath sounds, normal motor strength and tone, and a normal gait and station.  Dr. Carney prescribed Promethazine and Zithromax, and he refilled her maintenance medications.

On November 11, 2016, Plaintiff presented at DaySpring Behavioral Health for a diagnostic evaluation.  (ECF No. 8, pp. 53-60).  Although she claims to have always suffered from anxiety and depression, her symptoms intensified when she went through her divorce and again in 2008, when she was fired from her job.  At that time, she used drugs to cope with her symptoms and eventually became an addict.  Her mood and affect were appropriate, her behavior cooperative and calm, her thought processes normal, her memory intact, and her judgment and insight limited.  Plaintiff's intelligence level was estimated as borderline.  She was diagnosed with major depressive disorder and generalized anxiety disorder.  Leslie Wright, a licensed professional counselor, recommended individual therapy 2 or 3 times per month for approximately 12 months.

On December 2, 2016, Plaintiff reported improved activities of daily living with medication, although bending over and twisting aggravated her back pain.  (ECF No. 8, pp.

66-69).  Her blood pressure was elevated, but a physical exam was not conducted.  Dr. Carney diagnosed COPD, anxiety, depression, hypertension, osteoarthritis, and insomnia; prescribed Zolpidem; and, he refilled her regular medications.

On January 20, 2017, Plaintiff complained of fatigue, left arm pain, and bilateral knee pain.  (ECF No. 8, pp. 62-66).  An examination revealed normal ambulation, motor strength and tone, and sensation with continued musculoskeletal tenderness, range of motion limitation, and bony abnormality.  She also exhibited a normal mood and affect with no cardiopulmonary symptoms.  After diagnosing COPD, hypertensive disorder, osteoarthritis, hypothyroidism, anxiety, and depression, Dr. Carney prescribed Alprazolam and Oxycodone.

## IV.    Discussion

Plaintiff raises three issues on appeal: (1) whether the ALJ erred by failing to include her musculoskeletal spine disorder as a severe impairment; (2) whether the ALJ failed to fully and fairly develop the record; and, (3) whether the ALJ's RFC determination is supported by substantial evidence.

### A.  Severe Impairments

Plaintiff contends that the ALJ's failure to include her musculoskeletal spine disorder as a severe impairment requires reversal.  At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's

17

ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

Contrary to Plaintiff's argument, the record does not establish a severe back injury. While the evidence does reference a history of back pain, there are no objective tests to support a finding that this back pain limited the Plaintiff beyond the RFC found by the ALJ. The record contains only one reference to a decreased range of motion in Plaintiff's back. This occurred in December 2013, eight months prior to Plaintiff's alleged onset date. (ECF No. 8, pp. 282-283). Although the records from Dr. Carney do indicate that she exhibited musculoskeletal tenderness, a limited range of motion, and a bony abnormality, the records do not indicate exactly where this tenderness was located. He simply states the abnormalities were noted during a musculoskeletal exam. And, records indicate she also suffered from osteoarthritis of the knee, which the ALJ found to be a severe impairment.

Additionally, Plaintiff consistently reported to Dr. Carney that the medications prescribed to treat her pain had improved her ability to perform her activities of daily living, suggesting that her pain was amenable to treatment. (ECF No. 8, pp. 62-69, 74-86, 378-381, 435-442, 492-495, 535-542). *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). At times, she even reported a 90 percent improvement in her pain with medication, and she repeatedly denied medication side effects. (ECF No. 8, pp. 378-381, 435-442, 492-495, 535-542). We also note that the Plaintiff received only conservative treatment for alleged back pain. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding conservative treatment is inconsistent with disability). Although Dr. Carney prescribed Hydrocodone to

18

treat her pain, there is no evidence to suggest that her condition warranted surgical intervention or even epidural steroid injections.  There are also no records to indicate that Dr. Carney referred Plaintiff to a specialist.  And, aside from the medical source statement he completed at the Plaintiff's request, the record contains no physician imposed restrictions related to any of her alleged impairments.

Plaintiff's reliance on hospital records from August 2014, noting that she was taking pain medication for back pain is also misplaced, as she was treated for COPD and asthma with acute exacerbation on this occasion.  (ECF No. 8, pp. 312-332).  Plaintiff exhibited a normal range of motion in all areas tested.  Additionally, in November 2014, when she complained of pain radiating down her back, this was related pain she had reported in her right lung.  (ECF No. 8, pp. 383-410).  Again, Plaintiff was treated for bronchitis, not back pain.  Thus, Plaintiff's assertion that her back impairment was severe is not supported by the record.

Even if the Court were to find that a severe back impairment exists, the Plaintiff has failed to show any resulting harm.  Given Plaintiff's conservative care and the absence of self or physician imposed restrictions, the evidence does not support a finding that the Plaintiff's back pain would restrict her beyond the light RFC found by the ALJ.  Accordingly, remand would be futile.

### B.  Duty to Develop the Record

Next, the Plaintiff argues that the ALJ failed to fully and fairly develop the record concerning her mental and physical impairments.  The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  The ALJ is not

required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

The record contains a consultative mental examination conducted by Dr. Walz that predates the relevant time period; treatment notes and a medical source statement from Plaintiff's primary care physician, Dr. Carney; RFC assessments from non-examining physicians, Drs. Kogut, Davis, Brown, and Cathey; treatment records from Dr. Lange documenting her urological treatment; treatment notes from WACGC chronicling her mental health treatment; emergency room records; an adult function reported completed by the Plaintiff; and, Plaintiff's testimony. The Court finds that this evidence provides a sufficient basis for the ALJ's determination that the Plaintiff is not disabled.

Plaintiff insists that the ALJ's reliance on the assessments of Drs. Walz, Kogut, and Brown was improper because all exams predate her treatment at WACGC. A review of the records from WACGC, however, reveal that the Plaintiff was primarily treated for situational depression and anxiety related to the death of her mother, her ex's release from prison, her financial situation, and her physical diagnoses. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (holding that the ALJ may consider the situational nature of the Plaintiff's depression, due to marital issues). Additionally, progress notes indicate Plaintiff's symptoms

20

were responsive to the medications prescribed, when she was compliant with treatment. (ECF No. 8, pp. 299-300, 349-350, 415-416). Unfortunately, Plaintiff was not always compliant. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility). In fact, in April 2015, after failing a urine drug screen and admitting to the use of marijuana and methamphetamine, Nurse Gattis refused to prescribe her further medication. (ECF No. 8, pp. 488-490). At that time, Dr. Carney began prescribing her medications; however, progress notes consistently indicate that her mood and affect were normal, and she was fully oriented and alert. Accordingly, there was no need for a more recent consultative mental exam.

Plaintiff also insists that the ALJ's dismissal of Dr. Carney's medical source statement and the absence of a consultative physical exam leaves the record void of an assessment from an examining source, thus requiring reversal. There is no requirement, however, that an ALJ's RFC finding be supported by a specific medical opinion, examining or otherwise. *See Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-1093 (8th Cir. 2012) (same). And, in this case, the record also contains RFC assessments from two non-examining consultants, Drs. Davis and Cathey. (ECF No. 8, pp. 127-128, 144-145). In October 2014 and December 2014, respectively, the consultants reviewed Plaintiff's medical records and concluded she could perform light work with no postural, manipulative, visual, communicative, or environmental limitations. The ALJ properly utilized these assessments, in combination with the medical evidence and Plaintiff's statements, to conclude she could perform a range of light work. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (holding that opinions of

consultants supported by medical evidence and other evidence constitutes substantial evidence to support the ALJ's RFC determination). Accordingly, even without the assessment of an examining source, the undersigned finds that the record contained sufficient evidence upon which the ALJ could base his decision.

### C. RFC Determination

In her final issue, Plaintiff opposes the ALJ's RFC determination, alleging it is supported by neither the medical evidence nor the testimony. RFC is the most a person can do despite that person's limitations. 20 C.F.R. 416.945. A disability claimant has the burden of establishing her RFC. *Vossen,* 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks*, 687 F.3d at 1092.

As previously noted, the ALJ was well within his purview to rely upon the RFC assessments prepared by the non-examining sources. And, due to her repeated COPD and asthma exacerbations and diagnoses of depression and anxiety, he chose to include environmental restrictions and limit her to light, unskilled work.

Plaintiff's treating physician, Dr. Carney, prepared a medical source statement in August 2015. (ECF No. 8, pp. 507-509). He indicated she could lift and/or carry less than 10 pounds; stand and walk up to 2 hours in an 8-hour workday; sit less than 6 hours in an 8-hour workday; occasionally climb, balance, and kneel; and, never crouch or crawl. Further, Dr. Carney opined Plaintiff was limited in her ability to reach in all directions and handle due to pain and weakness in her upper extremities. He also concluded she would have limitations working near temperature extremes, dust, hazards, fumes, odors, chemicals, and gases, as working in these conditions would exacerbate her condition. The ALJ discounted most of Dr. Carney's assessment because it consisted of checkbox responses, was vague, lacked rationale, and was unsupported by the record. (ECF No. 8, pp. 35-36). The Court agrees. Plaintiff's relatively unremarkable physical and mental exams, responsiveness to pain medication, and the conservative nature of her treatment contradicts Dr. Carney's very restrictive RFC. While the Plaintiff was treated for knee pain, exams have consistently revealed a normal gait and station, normal motor strength and tone, and normal ambulation. As with her alleged back pain, there are no x-rays, MRIs, or CT scans documenting an impairment in her knee. Additionally, her treatment records contain no self or physician imposed physical restrictions. Thus, we can find no evidence to support Plaintiff's proposition she is only capable of performing sedentary work.

As for Plaintiff's mental RFC, although she was noted to be depressed, stressed, moody, or down on occasion when presenting to WACGC, her depression was situational in nature and responsive to medication. Moreover, Dr. Carney consistently noted a normal mood and affect with full orientation, and good insight and judgment. Notably, Plaintiff did not seek

out formal mental health treatment until after filing her application for benefits. Additionally, she was not always compliant with the treatment recommendations, did not consistently seek out treatment, and she admitted to illegal drug use. *See Roland v. Colvin*, No. 4:14-cv-22-DPM-BD, 2014 WL 6769901, at *3 (E.D. Ark. December 1, 2014) (holding drug use is an appropriate consideration in evaluation of credibility if it creates an inconsistency). This prompted the nurse practitioner at WACGC to stop prescribing her medication. Accordingly, the Court concludes that the ALJ's mental RFC is supported by substantial evidence.

## V.    Conclusion

Based on the foregoing, I recommend affirming the ALJ's decision and dismissing the Plaintiff's Complaint with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of June 2018.

/s/Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE